IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
ASSIGNED ON BRIEFS MAY 29, 2007

## IRINA N. PARRIS v. JERRAL D. PARRIS

**Direct Appeal from the Chancery Court for Grundy County**
**No. 5242     Buddy D. Perry, Judge, By Designation**

_____

**No. M2006–02068-COA-R3-CV - Filed September 18, 2007**

_____

This is a post-divorce case involving several issues stemming from a modification of child support and custody hearing and order resulting from that hearing. The parties were divorced in 2003, and the permanent parenting plan was filed on November 10, 2003. Wife retained custody of the parties' two minor children. Husband was to pay Wife $1,250 a month child support. In 2005, Husband filed motions to review and revise both the custody and visitation arrangements contained in the permanent parenting plan and his child support obligation. The court treated Husband's motions as a petition for modification of custody and child support. Husband represented himself *pro se* on July 17, 2006, at the petition hearing. The court entered an order on August 21, 2006, finding no material change of circumstance and thus, Wife retained custody of the two children. The order also increased Husband's child support obligation. Finally, the court found Husband in contempt of court and sentenced him to five days in jail with $1,000 bond. Husband appeals, arguing that 1) the court erred in finding no material change of circumstance; 2) the court erred in the findings concerning both Husband and Wife's income pertaining to the child support; and 3) the court erred in finding Husband in contempt. We affirm.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed &
Remanded**

ALAN E. HIGHERS, J., delivered the opinion of the court, in which DAVID R. FARMER, J., and HOLLY M. KIRBY, J., joined.

Janelle A. Simmons, Cherie L. Cash-Rutledge, Nashville, TN, for Appellant

Eric J. Burch, Manchester, TN, for Appellee

**OPINION**

## I.  FACTS & PROCEDURAL HISTORY

On May 5, 2003,[1] the Chancery Court for Grundy County, Tennessee, granted Irina N. Parris ("Wife" or "Appellee") and Jerral D. Parris ("Husband" or "Appellant") an absolute divorce.  The Permanent Parenting Plan was filed on November 10, 2003, and the court approved it on February 6, 2004.  The court awarded Wife custody of the parties' two minor children, and Husband's child support obligation was $1,250.

Husband filed a motion *pro se* on January 20, 2005, requesting that the court reduce his child support obligation.  Husband then filed a motion to alter or amend the judgment on March 28, 2005, requesting that the court review and revise the custody and visitation arrangement, and again requesting that the court reduce his child support obligation.  Wife moved to dismiss for failure to state a claim for which relief may be granted, pointing out that Husband should have filed a petition to modify instead of a motion to alter or amend the judgment.  On April 15, 2005, Judge Buddy Perry denied Husband's motion to reduce his child support obligation.  After numerous motions filed by Husband, the court entered an order on March 15, 2006, in which the court treated Husband's prior motions as a petition for modification of custody and child support.

At the petition hearing on July 17, 2006, Husband represented himself *pro se*.  The trial court heard testimony from the following six witnesses: Husband; Wife; Judge Larry Ross; Tami Poston Ross; Debra Linder; and Jimmy Lewis.  Husband first called Wife as a witness, and as to the custody issue, Husband introduced three photographs depicting Wife's house.  The two photographs, taken in 2006, depicted Wife's front porch piled with boxes and other debris. The third photograph of Wife's front porch was taken in 2002, when Wife moved into the house.  Husband contended that it looked like there was excrement on the porch, but Wife said that "I cannot tell you what's there on the front porch."  Wife testified that she holds yard sales from time to time, and that she stores the yard sale items in boxes on her front porch.  Husband asked Wife if she was embarrassed about the way her front porch looked, and Wife said no, "[i]t's neatly stacked in boxes . . . out of the way. Does not present any fire hazard as you['re] implying . . . .  Door access is completely free and windows [are] completely free."  Husband also questioned Wife concerning her boyfriend, to which Wife admitted that she and the children spent one night at the boyfriend's house due to bad weather.

As to Wife's financial condition, she testified that she makes a living as a teacher's assistant, with gross wages of around $715 a month. Wife also supplements her income by maintaining and renting six homes.  Wife additionally earned around $1,200 helping prepare tax returns.  As to her expenses, Wife testified that she purchased a new car with a $10,000 down payment and makes monthly payments.  In December 2005, when Wife purchased the car, she had in her checking account around $20,000.  Wife's testimony also revealed that Wife took a vacation with her two

---

[1] The parties' briefs claim the date of divorce is May 5, but in a petition for contempt found in the record, the date is said to be May 6.  In any event, the exact date of the divorce is not a contested issue in this appeal.

children on a cruise. Wife is originally from the former country of Ukraine, and Husband questioned Wife concerning her knowledge of the Ukraine's housing and economic situation, asking Wife, "Did I send information to you that you could be paid $85,000 a year to return to the Ukraine and help the people find housing?" Wife's counsel objected to the relevance of the question, and the judge tried to clarify what point Husband was trying to convey with the following exchange:

> The Court: Your [sic] proposing that she [Wife] should take the two girls and go back to the Ukraine?
>
> Mr. Parris: Well, why not? Not forever.
> The Court: I'm asking, is that what you're proposing she should do?
>
> Mr. Parris: Right, to enroll them in a Montessori school there and she help her countrymen, 25,000 people in the streets without homes, and she's got the skills and $85,000 salary, USA ID. She speaks the language.

When asked what he does for a living, Husband testified that he is a poet, but that he is also sole proprietor of Harmony Industries, a construction company. Husband claimed he could not remember submitting to the court his Harmony Industries check record, and the court interjected that "you either give me correct information or I'm going to draw some assumptions about your ability to earn. Now you can play games or not, so I'm putting you on notice about what's going to happen." Husband claimed that his income for both 2004 and 2005 was zero, and that his income for 2006 was "minus zero." Wife's counsel asked Husband if he knew that between April 2005 and April 2006, total deposits in his Harmony Industries checking account were $237,692.76; Husband responded that it could have, but that "I could say that I took in 210,000 and spent 230,000, so there you have it." The balance of Harmony Industries' account on April 17, 2006, was $42,000; on December 6, 2005, Harmony Industries deposited $33,990. Husband also owns rental properties, including one rental that generates $350 a month, and six rental cabins. Husband also admitted that his girlfriend regularly spends the night at his home when the children are present.

Concerning his two children, Husband reiterated that he believed it in the best interest of the children that Wife move to the Ukraine and they go with her: "I didn't say they would go to stay, they would go to learn, to a school, and if the environment is a little bit dangerous, then so be it." Husband also testified that he had been sentenced to serve 210 days for attempted extortion of Judge Larry Ross.

During the course of the hearing, Husband engaged in numerous arguments with the court. Judge Perry warned Husband at least five times that if his behavior persisted, he would be held in contempt of court. The first warning came after the judge excluded, upon Wife's counsel's objection, a psychological evaluation performed prior to the date of the divorce:

The Court: If it happened prior to the divorce decree I sustain the objection. We're trying what happened from the date of the divorce forward, and your burden is to show a change of circumstances from the date of the divorce forward . . . .

Mr. Parris: As to custody? In other words, anything in that person's history that they've done before a certain date has no reflection on custody.

The Court: The issue here is from the date of the divorce decree forward, and that's what we're looking at.

Mr. Parris: Even though that a - -
The Court: Sir, I'm not here to be your legal adviser, and I can't do that. I'm not here to engage in arguments with you about the law. I think I'm correct about it. If I'm incorrect, you get it reviewed at the next step.

Mr. Parris: So can I clarify what the Court said? The Court said that I'm not - -

The Court: I'm saying my obligation is to not retry the divorce case. I don't do that.

Mr. Parris: Even though I elected not to have a default trial - -
. . .

The Court: I'm telling you, the ruling I'm giving you is exactly the ruling I would give a lawyer that's standing there. That's the rulings you're entitled to. I've ruled, ask your next question.

Mr. Parris: Your Honor, I have a psychological evaluation of this woman [Wife] that was made before the divorce decree.

The Court: Sir - -

Mr. Parris: And I'm asking - -

-4-

| The Court: | You're about to approach the point of contempt, and you know what I'll do if I do that . . . . Don't stand there and continue to argue with me, because I'm not engaging in an argument with you. I don't do lawyers that way and I'm surely not going to let you do it that way. |
|---|---|
| Mr. Parris: | Well, is a psychological evaluation that's been done on this woman permissible in the custody trial? |
| The Court: | If it was prior to the divorce decree it's not . . . . |
| Mr. Parris: | Okay. And the fact that I'm entitled to a default jury trial and I elected not - - |
| The Court: | We've had that discussion and I'm not going back and having it [with] you again. |

Husband continuously attempted to testify during his direct examination of other witnesses. During Husband's direct examination of Wife, the judge notified Husband that "I'm reaching the point that you either start asking questions or I'm going to start holding you in contempt," and that Husband must "either do it properly [question the witness instead of trying to testify] or you're going to face the consequences for it. Now, if you want to try me, go ahead." The next warning came when Husband conducted his direct examination of Judge Larry Ross, who was involved in Husband's previous extortion trial. Husband questioned Judge Ross concerning matters involved with the previous trial held in Warren County, Tennessee, to which Wife's counsel objected. The court sustained the objection, and after several more sustained objections involving questions related to Judge Ross's own personal divorce, the identity of his ex-wife, and the name of his child from that previous marriage, the court warned Husband again that "the next time you do it I'm going to hold you in contempt of court and you're going to end up in jail. Now play however you want to play." Husband again tried to bring up the same issue concerning Judge Ross's divorce, and again the court told Husband that "if you go there again I'm going to find you in contempt and put you in jail, and I'm ready to do that at this point, and I don't think you believe me, so it's going to happen I suspect very quickly." Husband called Tami Poston Ross, wife of Judge Ross and former counsel for Wife during the divorce proceedings, as a witness. Husband likewise asked her questions concerning the attempted extortion trial and questions relating to Husband and Wife's divorce proceedings. Husband also questioned her concerning an incident, apparently prior to the divorce, in which she called the police because Husband would not leave her office. Husband then stated that "I didn't just barge in [to the office]," and asked her, "How quickly should a person leave?" The court then sustained an objection to the relevance of this line of questioning. Husband called as a witness Debra Linder, for the sole purpose of serving her a certified letter pertaining to what appears to be the prior divorce proceedings. Husband's questioning of Jimmy Lewis, a retired police officer, dealt with whether he ever saw Wife afraid, and that "on any occasion did the Court, outside the court, at

my residence, at the jail, anywhere, have you ever heard me raise my voice?" The witness answered in the negative, and Husband had no other questions. The breaking point came when Wife's counsel was conducting direct examination of Wife concerning income from her rental units:

> Q:           What about the other two [units] that are currently not rented?
>
> A:           Okay, unit E was rented 10 months out of 12.
>
> The Court:   Unit E?
>
> A:           Yes, unit E.
>
> Mr. Parris:   Jesus Christ.
> . . .
>
> The Court:   Do what? Do you want to end up going to jail right now? I heard what you said. You said Jesus Christ. I'm going to find you in contempt and I'm going to sentence you to five days in jail. You want to play those silly games, we're going to play them. That was totally uncalled for, Mr. Parris. I've bent over backwards to accommodate you today . . . .

At the conclusion of the hearing, the court requested that both parties submit a final decree, a parenting plan, and a child support worksheet to which the court would sign one, or if neither were appropriate, the judge would draw one himself. The court reiterated that Husband was found in contempt, and sentenced him to five days jail with $1,000 bond. The order dated August 22, 2006, found that Husband failed to carry his burden concerning a change in circumstance and held that the current permanent parenting plan would remain in place. The court also increased Husband's child support obligation from $1,250 to $1,646 a month, finding "a significant variance [in Husband's income] of more than fifteen percent." The court also found Husband in contempt of court and sentenced him to five days jail with bond set at $1,000.

## II. Issues Presented

Appellant filed a timely appeal[2] and presents the following issues for review:

1. Whether the trial court erred in finding Husband in contempt of court?
2. Whether the trial court erred in finding no material change of circumstance?
3. Whether the trial court erred in the calculation and increase of Husband's child support obligation?

For the following reasons, we affirm.

## III. Standard of Review

On appeal, we presume that the trial court's factual findings are correct, and we will not overturn those factual findings unless the evidence preponderates against them. Tenn. R. App. P. 13(d) (2006); ***Bogan v. Bogan***, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. ***Watson v. Watson***, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. R.R. Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). As to the trial court's conclusions of law, we review *de novo* upon the record with no presumption of correctness. ***Union Carbide Corp. v. Huddleston***, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)). If the trial court made no specific findings of fact, then we must look to the record to "determine where the preponderance of the evidence lies." ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002) (citing *Ganzenvoort v. Russell*, 946 S.W.2d 293, 296 (Tenn. 1997)). We will set aside a court's finding of contempt only if the court abused its discretion. ***State ex. rel. Flowers v. Tenn. Trucking Assoc. Self Ins. Group Trust***, 209 S.W.3d 602, 610 (Tenn. Ct. App. 2006) (citing *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993)). Abuse of discretion occurs only when the court applies a wrong legal standard or reaches an illogical decision or a decision that "causes an injustice to the party complaining." ***Id.*** (citing *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001)). We must not, however, substitute our judgment for that of the trial court. ***Id.*** (citation omitted).

---

[2] On December 14, 2006, we ordered Husband to either pay the litigation tax within ten days or show cause as to why this appeal should not be dismissed. Husband did not comply, and the court dismissed this appeal on January 4, 2007. Husband then filed a motion to reinstate, and we vacated the order of dismissal.

## IV. DISCUSSION

### A. Contempt

On appeal, Husband contends that the trial court erred in finding him guilty of contempt because his behavior did not rise to the level of obstruction of the administration of justice. We disagree.

We must first surmise whether the judgment in this case was civil or criminal contempt. *See State of Tennessee v. Turner*, 914 S.W.2d 951, 955 (Tenn. Crim. App. 1996). "The character and purpose of the punishment imposed generally serves to distinguish criminal from civil contempt proceedings." *Walker v. Walker*, No. 02A01-9209-CH-00263, 1993 WL 327826, at \*2 (Tenn. Ct. App. Aug. 20, 1993). The punishment imposed for criminal contempt is "punitive in character, and the proceeding is to vindicate the authority of the law, and the court as an organ of society." *Turner*, 914 S.W.2d at 955. Civil contempt, by contrast, is imposed for the benefit of the other party litigant. *Id.* Furthermore, contempt is classified as either direct or indirect: direct contempt is an act committed in the court's presence, and indirect contempt is an act committed outside the court's presence. *Id.* (citations omitted). The court may summarily punish an individual for direct contempt, but as for indirect contempt, the offender must be given notice and a hearing before punishment is imposed. *Id.*

The court's power to punish parties for courtroom misconduct is "absolutely essential to the smooth functioning of the judicial system." *Dargil v. Terminix Int'l Co., L.P.*, 23 S.W.3d 342, 344 (Tenn. Ct. App. 2000). The court's power to inflict such punishment for contempt is limited, however, to the following situations:

> (1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice;
>
> (2) The willful misbehavior of any of the officers of such courts, in their official transactions;
>
> (3) The willful disobedience or resistance of any officer of the such courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of such courts;
>
> (4) Abuse of, or unlawful interference with, the process or proceedings of the court;
>
> (5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them; or

-8-

(6) Any other act or omission declared a contempt by law.

Tenn. Code Ann. § 29-9-102 (2000). "An act of contempt is a willful or intentional act that hinders, delays, or obstructs the court's administration of justice." ***State ex. rel. Flowers v. Tenn. Trucking Assoc. Self Ins. Group Trust***, 209 S.W.3d 602, 612 (Tenn. Ct. App. 2006 (citing *Ahern v. Ahern*, 15 S.W.3d 73, 78 (Tenn. 20000); *Winfree v. State*, 175 Tenn. 427, 135 S.W.2d 454, 455 (1940)). "Willful" actions or conduct are voluntary or intentional rather than inadvertent or accidental. ***Id.*** (citations omitted). "An obstruction to the administration of justice is any willful misconduct which embarrasses, hinders, obstructs, or derogates the authority or dignity of the court." ***State of Tennessee v. Pease***, No. E2000-02469-CCA-R3-CD, 2001 WL 1284223, at *2 (Tenn. Crim. App. Oct. 24, 2001) (citing *Black v. Blount*, 938 S.W.2d 394, 401 (Tenn. 1996)).

In the present case, it is clear that the contempt at issue is criminal because the court sentenced Husband to jail as punishment for his courtroom behavior. Furthermore, we are dealing with direct contempt, as all Husband's statements and conduct occurred in Judge Perry's presence, and the judge summarily imposed punishment. In the court's order dated August 22, 2006, the judge made the following findings of fact concerning the contempt finding:

> Despite repeated admonitions from the Court, Mr. Parris persisted in arguments with the Court and offering extraneous comments during opposing counsel's questioning. During Mr. Burch's direct examination of Ms. Parris, Mr. Parris exclaimed "Jesus Christ" following a question and answer that apparently frustrated him. This outburst, in addition to the prior statements and actions of Mr. Parris, place him in contempt of court.

We cannot say that the trial court abused its discretion by holding Husband in contempt of court and sentencing him to five days in jail. From the record it is clear that the court was more than patient with Husband, giving him great leeway because he was representing himself. The court gave Husband numerous warnings that if he did not behave properly, he would be found in contempt and sentenced to jail. Husband nevertheless continued to argue with the judge, and his outburst of "Jesus Christ," viewed with his entire behavior during the hearing justified the contempt charge under Tenn. Code Ann. §29-9-102(1). His behavior and exclamation of "Jesus Christ" was obviously intentional or "willful," and this unnecessary outburst, along with his constant bickering with the court and inappropriate questioning of witnesses did "obstruct the administration of justice" by hindering the proceeding and trying to embarrass witnesses with completely irrelevant questions. "Court proceedings are to be conducted in a civil and dignified manner, and when one strays from that course, their conduct risks obstructing the administration of justice." ***State of Tennessee v. Provencio***, No. E2005-01253-CCA-R3-CD, 2005 WL 3088078, at *2 (Tenn. Crim. App. Nov. 18, 2005). In ***Provencio***, the Court of Criminal Appeals affirmed the lower court's finding of contempt based on the defendant's statement to the court: "I'm the victim here, and I'm being screwed around, and this lady f-king pulled my chain for I don't know how long." ***Id.*** Likewise, this court finds

Husband's language choice offensive and completely unnecessary, and we will not substitute our judgment for that of the court.

Husband argues that he should not be held in contempt because as a *pro se* litigant, he should have been able to "testify either in narrative or question and answer form." Husband relies on **State of Tennessee v. Pease**, No. E2000-02469-CCA-R3-CD, 2001 WL 1284223, at *3 (Tenn. Ct. App. Oct. 24, 2001), but this reliance is misguided. The court in this case did not bar Husband from testifying in narrative format like the court in **Pease**; rather, Husband was admonished several times for trying to testify during his direct examination of other witnesses and asking irrelevant questions. We also pointed out in **Pease** that "counsel should be permitted to elicit narrative questions that *do not unduly waste time . . . .*" **Id.** (emphasis added). While it is true that the court should take into account the fact that *pro se* litigants have no legal training, the court must nevertheless apply the same substantive and procedural rules that represented parties must follow. **Hessmer v. Hessmer**, 138 S.W.3d 901, 903 (Tenn. Ct. App. 2003) (citing *Edmundson v. Pratt*, 945 S.W.2d 754, 755 (Tenn. Ct. App. 1996); *Kayloir v. Bradley*, 912 S.W.2d 728, 733 n.4 (Tenn. Ct. App. 1995)). In any event, as evident from the abovementioned portions of the hearing, Husband's behavior went far beyond simply testifying in a narrative format.

Husband also argues that the court erred by not setting forth the specific elements of Tenn. Code Ann. § 29-9-102 in the order. We reject this argument. Although the court's order did not use the specific language from the Tennessee Code, the court did specifically find Husband in contempt and listed the reasons. The court could have found Husband in contempt under section (1) of 29-9-102, as we have previously discussed, for his willful misbehavior that obstructed the administration of justice. Alternatively, the court could have found Husband in contempt under section (4), for abuse of the proceedings. The judge pointed out in the final order that Husband had ulterior motives for this hearing, as is evident from the record. Husband's questioning of Judge Ross related in most part to the attempted extortion trial. The questioning of Tami Poston Ross, Judge Ross's wife, also dealt with the extortion trial. The only questions asked to Debra Linder concerned the certified letter, which was completely unrelated to the issue at hand. Finally, Husband questioned Jim Lewis, a retired police officer, as to whether he had ever witnessed Husband in any kind of threatening manner or had ever heard Husband raise his voice. It is unclear why this testimony was introduced. Husband's behavior showed a great disrespect to the court, using a custody hearing as a vehicle for what appears to be harassment of these witnesses, and thus we affirm.

## B.

### *Modification of Child Custody*

Husband argues that the lower court erred by finding no material change in circumstance warranting the change in custody from Wife to Husband. We disagree.

Once a decision regarding custody is made, it is considered *res judicata* on facts that existed at that time or facts that should have been reasonably foreseeable. **Curtis v. Hill**, 215 S.W.3d 836, 840 (Tenn. Ct. App. 2006). This is not to say that courts cannot alter a custody arrangement when there are intervening circumstances: "Such decrees shall remain within the control of the court and be subject to such changes or modification as the exigencies of the case may require." Tenn. Code Ann. § 36-6-101(a)(1) (Supp. 2006); *See* **Clark v. Arthur**, No. M2005-01719-COA-R3-CV, 2007 Tenn. App. LEXIS 293, at *11 (Tenn. Ct. App. May 30, 2007) (citing *Krupp v. Cunningham-Grogan*, No. M2005-01098-COA-R3-CV, 2006 Tenn. App. LEXIS 568, at *7 (Tenn. Ct. App. Aug. 29, 2006)). The party seeking the modification of a court's prior custody decree has the burden of proof:

> If the issue before the court is a modification of the court's prior decree pertaining to custody, *the petitioner must prove by a preponderance of the evidence a material change in circumstance*. A material change of circumstance does not require a showing of a substantial risk of harm to the child. A material change of circumstance may include, but is not limited to, failures to adhere to the parenting plan or an order of custody and visitation or circumstances that make the parenting plan no longer in the best interest of the child.

Tenn. Code. Ann. § 36-6-101(a)(2)(B) (Supp. 2006) (emphasis added). The "threshold issue" for the lower court is "whether a material change in circumstances has occurred after the initial custody determination." **Kendrick v. Shoemake**, 90 S.W.3d 566, 570 (Tenn. 2002) (citing *Blair v. Badenhope*, 77 S.W.3d 137, 150 (Tenn. 2002)). Although there are no bright-line rules a court should apply in determining whether a party has proven a change in circumstance, the Tennessee Supreme Court has laid out the following guidelines:

> (1) whether a change has occurred after the entry of the order sought to be modified;
>
> (2) whether a change was not known or reasonably anticipated when the order was entered; and
>
> (3) whether a change is one that affects the child's well-being in a meaningful way.

**Cranston v. Combs**, 106 S.W.3d 641, 644 (Tenn. 2003) (citing *Kendrick*, 90 S.W.3d at 570; *see also Blair*, 77 S.W.3d at 150)). A parent's change in circumstances could be considered a "material change in circumstance" warranting a modification in custody, if the change affects the well-being of the child. **Kendrick v. Shoemake**, 90 S.W. 3d 566, 570 (Tenn. 2002). Only if a court finds that there has been a material change in circumstance does it proceed to the next step in the analysis, which is to determine whether a modification would be in the child's best interest. **Id.**

In the present case, the court found that Husband had not met his burden concerning a material change in circumstance, and thus did not get into an analysis of whether the change in custody would be in the best interest of the children. Husband contends that the court failed to support its conclusion that Husband had not met his burden concerning a change in custody. We disagree. The court stated in the order that "Mr. Parris' testimony relevant to the custody was 'all over the board.'" Husband "initially took the position that the children should live with him for four years because they had lived with the mother for four years. Later in the hearing, Mr. Parris advocated that the children should relocate to the Ukraine . . . ." The court pointed out that Husband's questioning of witnesses yielded irrelevant information that would not help Husband with proving that a material change of circumstance occurred; if anything, it showed Husband "as a man who was delusional and out of control during the original divorce litigation."[3] The court did take into consideration the fact that Wife stayed the night at her boyfriend's home with the two children on one occasion due to bad weather, but the court also noted that Husband also "admitted that his girlfriend spent almost every night in his home when the children were present." From review of the record, we cannot say that the evidence preponderates against the trial court's findings of fact.

More specifically, though, Husband argues that the court erred by its failure to address the safety and cleanliness of Wife's home. Although it is true that the court did not mention these issues in the order, we find that this evidence does not require a finding in Husband's favor. The only evidence introduced at the hearing pertaining to safety and cleanliness were the photographs taken of Wife's home, a photograph dated 2002 and the others dated 2006. Each photograph depicted Wife's front porch. The 2002 picture showed boxes, trash bags, a piece of furniture, and various other items; the 2006 pictures were similar, except the front porch appeared more piled up than the 2002 picture. Wife testified that these items do not pose a safety problem, and Husband did not testify as to Wife's home's alleged safety and cleanliness problem. Judge Larry Ross did testify that he had known Wife approximately five years, and that every time he ever saw the children, they had a clean appearance. Based on the witnesses' credibility, the court could have simply found that Wife's home had not become unsafe or unclean and thus, he did not find the pictures helpful in determining whether a material change in circumstance had occurred. As we have pointed out in previous cases, "[c]ustody decisions often hinge on subtle factors, such as the parents' demeanor and credibility during the proceedings." *Morman v. Morman*, No. M2005-00931-COA-R3-CV, 2006 WL 2068757, at *2 (Tenn. Ct. App. July 25, 2006) (citing *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997)). Looking at the record, the 2006 pictures do not show much of a change in the appearance of the condition of the front porch as compared to the 2002 picture. This

_____

[3] As to Wife's parenting skills, "Judge Ross and Tami Ross both testified that Ms. Parris was an exemplary mother and the children were well mannered, happy and healthy children." The court further pointed out that Wife "is intimately involved in the well-being of her children. She is involved in the children's schooling and activities . . . . By all witness accounts, including Mr. Parris, the children are doing very well in school." There have been cases where a modification of the custody decree was justified due to the child's poor performance in school, *see Donegan v. Donegan*, No. 01A01-9805-CH-00258, 1999 WL 10086, at *6 (Tenn. Ct. App. Jan. 12, 1999), but as just stated, the children in this case are performing well in school.

alone is not enough to cause the evidence to preponderate in Husband's favor. Thus, we reject Husband's argument.

Husband also argues that the trial court erred by placing no weight on the fact that the children are "terrified" of Wife. This argument has no merit. The court properly disregarded this evidence because Wife's counsel moved to strike Husband's statements as to what the children allegedly said, and it was so stricken from the record.[4] As to the same contention that the court placed no weight on evidence that the children said that they wished to spend more time with their father, we also reject it. We do not find such evidence in the record, as the children did not testify.[5]

Finally, Husband argues that the court erred by failing to consider a modification of visitation. Husband relies on ***Wagner v. Gaston***, No. 01A01-9804-CV-00215, 1999 WL 767825, at *1 (Tenn. Ct. App. Sept. 29, 1999), but that case is distinguishable from the case at bar. In ***Wagner***, the father included in his petition to modify an alternative request for an increase in visitation. Although it is true that Husband made a motion "to review and revise the visitation/custody arrangements," this motion was not proper per the Tennessee Rules of Civil Procedure. The judge gave Husband great leeway in his pleadings because he was representing himself, and treated all of Husband's prior motions as a petition for modification of custody only: "The defendant has been advised by the Court to be successful regarding a change of custody that it is incumbent upon the defendant to show a material change of circumstances. The Court is going to treat the prior motion as a petition for modification of custody and child support . . . ." Furthermore, Husband did not request at the hearing that the court modify the visitation schedule. Nor can we say that the issue was tried by implied consent. *See generally* ***Zumstein v. Smith***, No. 03A01-9409-CH-00346, 1995 WL 113472, at *3 (Tenn. Ct. App. Mar. 16, 1995). Apparently, Husband is arguing that the court should have acted *sua sponte* and modified the visitation schedule. In ***Fenley v. Fenley***, No. 03A01-9604-CH-00121, 1996 WL 469683, at *3 (Tenn Ct. App. Aug. 19, 1996), we held that the trial court erred in modifying *sua sponte* the visitation schedule at a modification of child custody hearing. In ***Fenley***, the father's petition alleged that a material change in circumstance justified change of custody. ***Id.*** at *1. It did not, however, allege alternatively that

---

[4] Concerning the children's dispositions, Wife's attorney asked Husband, "I thought you said they [the children] weren't well mannered all the time," to which Husband responded that the children are "terrified of their mother, they're terrified of their mother, and I can quote what the children say, don't get on the wrong side of mother, you don't want her as an enemy." Wife's counsel then moved to strike, and the court granted the motion. We also point out that Husband failed to argue on appeal that the exclusion of this evidence was error, and thus we will not get into that analysis.

[5] Husband's brief points to Husband's following answer to the judge's question of whether he wanted to call his children as witnesses as the evidence of the children's preferences:

> "Your Honor, it would be a telling statement that the children would make if we were to ask them in front of you, would you like to spend half the time with your daddy and half the time with your mother and then they responded to that, would that be of any [Court interjects]."

the court should modify the visitation arrangement. *Id.* As we pointed out in that case, a judgment beyond the pleadings is invalid. *Id.* at *3 (citations omitted). Thus, the court was correct in not addressing issues pertaining to modification of visitation. In sum, we find that the court's findings are more than supported by the evidence in the record.

## C.

### *Modification of Child Support*

Husband contends that the court erred in its calculation and increase of his child support obligation. We disagree.

The court made the following findings of fact in the order dated August 22, 2006, concerning Husband's income: "Mr. Parris exhibited a proposed child support worksheet showing that his income was zero. However, the deposits in his business checking account for the last year of the records show that he made deposits of $237,692.76 . . . . [I]t appears to the Court that of the total deposits, $191,109.87 came from business income." The court had more difficulty with Husband's business expenses, however:

> [I]t is difficult for the Court to determine what is business-related . . . because it appears that Mr. Parris pays all his living expenses out of his business account . . . . From a review of Exhibit 24, the Court finds that his business expenses form [sic] April 17, 2005 until April 17, 2006 total $41,880.91. This leaves Mr. Parris with a net income of $149,228.96."

Based on this information, the court found a significant variance greater than fifteen percent, and thus increased Husband's child support obligation from $1,250 to $1,646.[6]

Husband argues that the court erred in applying the Child Support Guidelines ("Guidelines") as they relate to his self-employment income. Husband does not specify as to how the court erred in its application, other than by pointing to the Guidelines dealing with adjustments to gross income for self-employed parents.[7] We affirm.

___

[6] The court went on to say that Husband's support obligation would be modified "as reflected in the attached child support worksheet." The child support worksheet was not included in the record.

[7] Husband argues that "[h]ad the Trial Court correctly applied the Child Support Guidelines as it relates to self-employed parents the Appellant's gross income would have significantly varied from what the Court found the income to be." Husband further argues that had the court "properly considered the evidence presented by the Appellant as it related to this income the ruling would have been dramatically different." Husband fails to tell us how or why "the

(continued...)

Trial courts have the authority to increase or decrease child support obligations when there is a "significant variance between the amount of support provided in the child support guidelines and the amount of support currently ordered . . . ." ***Willis v. Willis***, 62 S.W.3d 735, 738 (Tenn. Ct. App. 2001) (citing Tenn. Code Ann. § 36-5-101(a)(1) (Supp. 2000)). The Guidelines specify that a "significant variance" must be "at least a fifteen percent (15%) change between the amount of the current support order (not including any deviation amount) and the amount of the proposed presumptive support order . . . ." Tenn. Comp. R. & Regs. 1240-2-4-.05(2)(c) (2006). Child support obligations are based upon net income as defined in Tenn. Comp. R & Regs. 1240-2-4.03(4) (2006). In order to determine net income, the court must first determine gross income, which is defined as follows:

> (3) Gross income.
>
> (a) Determination of Gross Income.
>
> 1. Gross income of each parent . . . shall include all income from any source (before deductions for taxes and other deductions such as pre-existing child support orders and credits for other qualified children), whether earned or unearned, and includes, but is not limited to, the following:
>
> (i) Wages;
>
> (ii) Salaries;
>
> (iii) Commissions, fees, and tips;
>
> (iv) Income from self-employment;
>
> . . .
>
> 3. Self-Employment Income.
>
> (i) Income from self employment includes income from, but not limited to, business operations, work as an independent contractor or consultant, sales of goods or services, and rental properties, etc., less ordinary and reasonable expenses necessary to produce such income.
>
> (ii) Ordinary and Reasonable Expenses of Self Employment Necessary to Produce Income.

---

[7](...continued)
ruling would have been dramatically different."

(I) Excessive promotional, excessive travel, excessive car expenses or excessive personal expenses, or depreciation on equipment, the cost of operation of home offices, etc., shall not be considered reasonable expenses.

(II) Amounts allowed by the Internal Revenue Service for accelerated depreciation or investment tax credits shall not be considered reasonable expenses.

Tenn. Comp. R. & Regs. 1240-2-4-.04(3) (2006).

Husband cites to Tenn. Comp. R. & Regs. 1240-2-4.04(4)[8] in support of the argument that the trial court incorrectly applied the Guidelines. Again, as we have mentioned, Husband does not specify in his argument how the court erred in its application of the Guidelines. From the record, it does not appear that the trial court made any adjustments to Husband's income as provided in Tenn. Comp. R. & Regs. 1240-2-4.04(4). It does appear, however, that the court implicitly found Husband's income information unreliable. The court disregarded Husband's tax returns and statements that he had a zero net income, and found his net income to be $149,228.96 based on Husband's business

---

[8] The Guidelines provide as follows:

(4) Adjustments to Gross Income for Self-Employed Parents.

1. (a) The Child Support Schedule includes deductions from a parent's gross income for the employee's share of the contributions for the first six and two-tenths percent (6.2%) in Federal Insurance Contributions Act (FICA) and one and forty-five hundredths (1.45%) in Medicare taxes. The full tax rate, fifteen and three-tenths percent (15.3%), is a total of twelve and four-tenths percent (12.4%) for social security (old-age, survivors, and disability insurance) and two and nine-tenths percent (2.9%) for Medicare (hospital insurance). All net earnings of at least four hundred dollars ($400) are subject to the Medicare part. Employers pay one-half of an employee's FICA and Medicare taxes.

(b) For a self-employed parent who is paying self-employment tax, an amount for FICA -- six and two-tenths percent (6.2%) Social Security plus one and forty-five hundredths percent (1.45%) Medicare as of 1991, or any amount subsequently set by federal law as FICA tax -- shall be deducted from that parent's gross income earned from self-employment, up to the amounts allowed under federal law, and actually paid by the parent.

(c) Social Security tax withholding (FICA) for high-income persons may vary during the year. Six and two-tenths percent (6.2%) is withheld on the first ninety thousand dollars ($90,000) of gross earnings (for wage earners in 2005). After the maximum five thousand five hundred eighty dollars ($5,580) is withheld, no additional FICA taxes are withheld.

(d) Self-employed persons are required by law to pay the full FICA tax of twelve and four tenths percent (12.4%) up to the ninety thousand dollars ($90,000) gross earnings limit and the full Medicare tax rate of two and nine tenths percent (2.9%) on all earned income. One half of each amount is already accounted for in the BCSO amounts on the Schedule.

(e) Any self-employment tax paid up to one-half of the maximum amounts due in a year shall be deducted from gross income as part of the calculation of a parent's Adjusted Gross Income, as indicated in Part II of the CS Worksheet.

(f) When calculating credits for other qualified children under paragraph (5) below, any self-employment tax paid shall also be deducted on the Credit Worksheet from a parent's gross income for the purposes of calculating a theoretical child support order.

(g) The percentages and dollar amounts established or referenced in this paragraph (4) with respect to the payment of self-employment taxes shall be adjusted by the Department or by the tribunal, as necessary, as relevant changes occur in the federal tax laws.

account deposits and business expenses. The Tennessee Supreme Court has noted the following concerning self-employment income:

> These self-employment guidelines are fashioned in such a way as to authorize the trial court to address the potential of a self-employed obligor to manipulate income for the purpose of avoiding payment of child support. Courts have recognized that a self-employed obligor has the opportunity 'to manipulate his reported income by either failing to aggressively solicit business or by inflating his expenses, thereby minimizing his income.' Based on this reasoning, in certain situations, a court may impute income to a sole owner of a business.

*Taylor v. Fezell*, 158 S.W.3d 352, 358 (Tenn. 2005) (citations omitted). We find that the court, after finding Husband's information unreliable, correctly determined Husband's income from reliable information relating to his deposits and business expenses. *See generally* **Radebaugh v. Radebaugh**, No. M2005-02727-COA-R3-CV, 2006 WL 3044155, slip op. at *12 (Tenn. Ct. App. Oct. 26, 2006) (remanding a similar case to the trial court for re-calculation of the husband's child support obligation based on reliable information pertaining to his gross receipts and business expenses).

As to Wife's income, the court found that Wife received $8,266.56 from her teaching assistant position. She also earned $1,200 in 2005, by assisting in preparing tax returns, and $1,258 from her work at Sethra. Finally, the court found that Wife's rental homes yielded $16,354.00 in 2005, less maintenance expenses of $10,004.52, leaving Wife with a net rental income of $6,349.48. Husband argues that the court erred by not taking into consideration Wife's Social Security Medicare Income of $8,266.56. This argument has no merit. In the final order, the judge specifically found that Wife "made $8,266.56 from her teaching position in Grundy County in 2005."[9] Husband next argues that the court erred by not imputing income to Wife because she is willfully underemployed; she failed to provide a reliable income information at the hearing; and she leads an extravagant lifestyle. We disagree.

Husband argues that Wife is underemployed because she has the equivalent of a Master's Degree and has tax preparation and bookkeeping experience. Husband next argues that the court failed to consider Wife's extravagant lifestyle, including $20,000 in her savings account in 2005; the purchase of a vehicle with a $10,000 down payment; and the taking of a cruise vacation. Husband also argues that "it is proper pursuant to the current Tennessee Child Support Guidelines to find that a parent is willfully voluntarily underemployed when there is no reliable source of income . . . ." We

---

[9] From a review of Wife's W2 statement, the judge used the Medicare wages and tips amount to calculate Wife's's income, he just did not label it as such in the order.

address the latter argument first and find that Husband's counsel has misread the Guidelines. Whether the court lacks reliable evidence of income is not part of the analysis of whether a parent is willfully underemployed.[10] Next, we address Husband's argument that Wife is willfully underemployed, and thus the court erred in calculating her income. The Guidelines allow for a court to impute income if that parent "has been determined by a tribunal to be willfully and/or voluntarily underemployed or unemployed."[11] Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(a)2(I) (2006). "The

_____

[10] Failure to provide reliable evidence of income is a separate situation where the court may impute income to the parent. The Guidelines provide the following concerning a lack of reliable evidence:

> (II) When Modifying an Existing Order
>
> 1. I. If a parent fails to produce reliable evidence of income (such as tax returns for prior years, check stubs, or other information for determining current ability to support); and
>
> II. The tribunal has no reliable evidence of that parent's income or income potential;
>
> III. Then, in such cases, gross income for the current and prior years shall be determined by imputing annual gross income of thirty-six thousand three hundred sixty-nine dollars ($36,369) for male parents and twenty-six thousand nine hundred eighty-nine dollars ($26,989) for female parents . . . .

Tenn. Comp. R. & Regs. 1240-2-4-.04(3)(II) (emphasis added). Husband's counsel does point out, though, that Wife did not have her 2005 tax return available at the hearing, but we find that this is not enough to impute income to Wife under this provision of the Guidelines. Wife did not have her 2005 tax return available at the hearing, and the judge told husband numerous times that he would be more than happy to reschedule the hearing so that this information would be available; Husband declined. Wife did have available her W2 and 1099 statements for 2005. She also testified as to her rental income from each property. Thus, Wife did produce "other information for determining current ability to support," and the court based its decision on reliable evidence of Wife's income.

_____

[11] The Guidelines further state:

> 1. The Guidelines do not presume that any parent is willfully and/or voluntarily under or unemployed. The purpose of the determination is to ascertain the reasons for the parent's occupational choices, and to assess the reasonableness of these choices in light of the parent's obligation to support his or her child(ren) and to determine whether such choices benefit the children.
>
> (I) A determination of willful and/or voluntary under or unemployment is not limited to occupational choices motivated only by an intent to avoid or reduce the payment of child support. The determination may be based on any intentional choice or act that affects a parent's income.
>
> (II) Once a parent that has been found to be willfully and/or voluntarily under or unemployed, additional income can be allocated to that parent to increase the parent's gross income to an amount which reflects the parent's income potential or earning capacity, and the increased amount shall be used for child support calculation purposes. The additional income allocated to the parent shall be

(continued...)

-19-

determination of whether a particular parent is willfully and voluntarily unemployed or underemployed is fact-dependent, and can only be made after consideration of all the circumstances surrounding that parent's past and present employment or business activities." ***Ralston v. Ralston***, No. 01A01-9804-CV-00222, 1999 WL 562719, at *3 (Tenn. Ct. App. Aug. 3, 1999).

Under the Guidelines, there is no presumption that a parent is willfully underemployed, and the issue was not raised at the hearing. Thus, Husband cannot bring it up for the first time on appeal. But even after reviewing the record, including testimony concerning Wife's present and past employment, and her education and lifestyle, we cannot say that the trial court erred by not determining that Wife is willfully underemployed. Absent a written finding that Wife is underemployed, the trial court was correct in basing the child support obligation on her actual income at the time of the hearing. *See generally **Via v. Via***, No. M2006-02002-COA-R3-CV, 2007 WL 2198187, at *5 (Tenn. Ct. App. July 23, 2007). Wife is originally from the former Ukraine and went to school in that country. Although Wife testified that per her education there, she has a master's degree, she also testified that she was taking some United States college courses online because she is not certified to teach in this country. Wife also testified that she has helped prepare tax returns, but lacks formal accounting training and testified that she was not proficient in preparing tax returns. There is no proof as to what other amounts Wife has ever made during her life other

---

[11](...continued)
> determined using the following criteria:
>
> I. The parent's past and present employment; and
>
> II. The parent's education and training.
>
> . . .
>
> The following factors may be considered by a tribunal when making a determination of willful and voluntary underemployment or unemployment:
>
> (I) The parent's past and present employment;
>
> (II) The parent's education, training, and ability to work;
>
> . . .
>
> (IV) A parent's extravagant lifestyle, including ownership of valuable assets and resources (such as an expensive home or automobile), that appears inappropriate or unreasonable for the income claimed by the parent;
>
> . . .
>
> (VI) Whether unemployment or underemployment for the purpose of pursuing additional training or education is reasonable in light of the parent's obligation to support his/her children and, to this end, whether the training or education will ultimately benefit the child in the case immediately under consideration by increasing the parent's level of support for that child in the future;

(VII) Any additional factors deemed relevant to the particular circumstances of the case.

than the amount as a teacher's assistant, nor is there any proof in the record that Wife left a higher paying job to take the job of teacher's assistant. As to the extravagancy of Wife's lifestyle, we find that the facts in this case do not support such a conclusion. Wife's purchase of a vehicle and taking of a family vacation do not rise to the level of indicating that she has secret wealth that should be imputed for purposes of child support, nor does this alone indicate that she is leading an extravagant lifestyle. For the aforementioned reasons, we affirm.

### D.

### *Attorney's fees on Appeal*

Appellee has requested attorney's fees on appeal. An award of attorney's fees is available only if provided for by statute, contract, or a recognized equitable ground. *Parchman v. Parchman*, No. W2003-01204-COA-R3-CV, 2004 Tenn. App. LEXIS 768, at *15 (Tenn. Ct. App. Nov. 17, 2004) (quoting *Austin Powder Co. v. Thompson*, No. 03A01-9607-CV-00229, 1996 Tenn. App. LEXIS 805, at *5 (Tenn. Ct. App. Dec. 16, 1996)). "In divorce cases the recovery of attorney's fees is permitted by statute, which provides that a spouse seeking enforcement of an alimony or custody award may be granted attorney's fees." *Id.* (citing Tenn. Code Ann. § 36-5-103(c) (2003)). Furthermore, it is in the sole discretion of this court whether to award attorney's fees on appeal. *See Id.* at *15-16 (citing Tenn. Code Ann. § 36-5-103(c) (2003); *Archer v. Archer*, 907 S.W.2d 412, 419 (Tenn. Ct. App. 1995)). As such, when this Court considers whether to award attorney's fees on appeal, we must be mindful of "the ability of the requesting party to pay the accrued fees, the requesting party's success in the appeal, whether the requesting party sought the appeal in good faith, and any other equitable factor that need be considered." *Dulin v. Dulin*, No. W2001-02969-COA-R3-CV, 2003 Tenn. App. LEXIS 628, at *26-27 (Tenn. Ct. App. Sept. 3, 2003) (citing *Folk v. Folk*, 210 Tenn. 367, 357 S.W.2d 828, 829 (Tenn. 1962)); *see also Parchman*, 2004 Tenn. App. LEXIS 768 at *15-16. Considering Appellee's income and her success in this appeal, we find it equitable to award Appellee's attorney's fees.

### V.   CONCLUSION

For the aforementioned reasons, we affirm the decision of the trial court. Further, we award attorney's fees to Appellee. The matter is remanded to the trial court to determine the amount of fees that are reasonable and necessary in this case. Costs of this appeal are taxed to Appellant, Jerral D. Parris, for which execution may issue if necessary. _____

                                        _____
                                        ALAN E. HIGHERS, JUDGE